# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 29 2020, 9:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John R. Worman
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Sarah J. Shores
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of Parental Rights of:

B.B. and A.D., *(Minor Children)*

and

R.B., *(Mother)*

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Plaintiff,*

January 29, 2020

Court of Appeals Case No.
19A-JT-1875

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

The Honorable Beverly K. Corn, Referee

Trial Court Cause Nos.
82D04-1902-JT-276
82D04-1902-JT-277

**Robb, Judge.**

# Case Summary and Issue

[1] R.B. ("Mother") appeals the juvenile court's termination of her parental rights to two of her children. The sole issue Mother presents on appeal is whether the juvenile court's termination of her parental rights was clearly erroneous. Concluding it was not, we affirm.

# Facts and Procedural History

[2] Mother is the biological mother of five children, two of whom are the subject of this appeal: B.B., born January 17, 2015, and A.D., born December 19, 2016 (collectively "Children"). Mother has a history with the Indiana Department of Child Services ("DCS") and does not have custody of her other three children.[1]

[3] On or about August 30, 2017, DCS received a report that Mother had been admitted to St. Vincent Hospital for an overdose/attempted suicide after ingesting twenty-five Klonopin and Mother had tested positive for methamphetamine, amphetamine, benzodiazepine, and marijuana. Mother was diagnosed with bipolar disorder, depression, post-traumatic stress disorder, and borderline personality disorder. In addition, when a DCS family case manager ("FCM") visited her home to complete an assessment, Vectren arrived

---

[1] Children in need of services ("CHINS") petitions were filed with respect to Mother's other children in 2008 and 2014. In addition, we note that A.D.'s father voluntarily terminated his parental rights and DCS filed a petition to terminate B.B.'s father's rights; however, there is no evidence in the record as to the result. Therefore, we have limited our recitation of the facts to those pertaining primarily to Mother, except as necessary.

to shut off the electricity and gas in the house, and Mother refused to cooperate with the FCM. At the time, B.B.'s whereabouts were unknown, and Mother only stated that B.B. had been staying with an out-of-state relative since July. A.D. was removed on August 31 and placed with her biological father.[2]

[4] On September 5, 2017, DCS filed separate petitions alleging Children were children in need of services ("CHINS") based on Mother's overdose/suicide attempt, substance abuse, mental health condition, and unsuitable home conditions. Exhibits, Volume I at 101-03, 231-33. An initial/detention hearing was held the same day during which Mother admitted the Children were CHINS. The juvenile court adjudicated the Children as such. B.B. was located and placed in foster care on September 7; A.D. remained with her father.

[5] On October 3, 2017, the juvenile court held a dispositional hearing and subsequently entered a dispositional order requiring Mother (among other things) to: maintain weekly contact with the FCM; complete a substance abuse assessment and follow all treatment recommendations; submit to random drug screens; refrain from drugs and alcohol; attend supervised visitation; and cooperate with parent aid and mental health services and follow all treatment recommendations. Initially, Mother was compliant; she attended Counseling

---

[2] With respect to B.B., we note that prior to DCS' involvement in the instant matter, B.B. tested positive for methamphetamine, THC, and Demerol shortly after birth and as such, was adjudicated a CHINS in 2015. As part of the case, Mother was ordered to submit to random drug screens, remain drug and alcohol free, and complete a substance abuse evaluation and follow all recommendations. *See* Exhibits, Volume I at 27. The matter was dismissed in April 2016. *See id*. at 37-38.

for Change, submitted to drug screens, and participated in supervised visitation. Because the Children were in separate homes, Mother had to have separate visitations with each child. After DCS transitioned Mother to unsupervised visitation at her home around November 2017, Mother would no show[3] and DCS placed her on a two-hour call ahead. Mother failed to comply and refused to have visits with Children separately, which promoted DCS to assign a parent aide to help Mother with transportation. However, when the aide visited the home, Mother refused to have a visit. Eventually, Mother missed three visits without calling ahead and DCS placed visitation on hold. *See* Transcript, Volume II at 110-11. On November 28, Mother tested positive for methamphetamine and, around this time, ceased contact with DCS.

[6]     On January 16, 2018, DCS filed a Request for Taking or Continued Custody of A.D. due to her father's failure to comply with services and refusal to cooperate with DCS. *See* Exhibits, Vol. I at 87. The next day, the juvenile court entered an emergency order granting DCS' request and A.D. was placed in foster care. In a progress report filed on February 12, 2018, DCS reported that Mother had not participated in services and had not contacted the FCM for several months. DCS further reported that, at the time, Mother was not completing drug screens or participating in visitation, and she did not provide an explanation as to why

---

[3] Based on the evidence in the record, it is unclear how many visits Mother failed to attend.

she had not exercised visitation with Children. Following a detention hearing on February 13, the juvenile court ordered that A.D. remain in foster care.

[7] On February 20, 2018, the juvenile court held a periodic case review hearing for which Mother failed to appear. Therefore, the juvenile court issued a warrant for Mother's arrest. *See id*. at 160, 177. Following the hearing, the juvenile court entered an order finding that Mother had not complied with Children's case plan or services offered by DCS, enhanced her ability to fulfill her parental obligations, maintained contact with the FCM, or participated in visitation for several months. The juvenile court changed B.B.'s permanency plan from reunification to adoption. Exhibits, Vol. II at 29-30. Mother was later arrested on June 8. Exhibits, Vol. I at 83, 180-82. Throughout this case, Mother had multiple outstanding warrants for her arrest in Warrick and Vanderburgh County for various criminal and child support matters.

[8] A.D. was placed with B.B.'s foster family on March 5, 2018. From December 2017 to June 2018, Mother ceased all contact with DCS and was unable to be located. Following Mother's arrest, FCM Julie McDaniel[4] successfully contacted Mother in June. At that time, Mother chose to go back to Counseling for Change with a new referral for a substance abuse evaluation, treatment, and drug screens. On July 30, 2018, DCS filed a permanency report informing the court that Mother: tested positive for amphetamine,

---

[4] Julie McDaniel was previously known as Julie Fortney. *See* Tr. Vol. II at 107.

methamphetamine, and THC on July 18; failed to participate in visitation for several months; and "only recently inquired about visitation with her [C]hildren." *Id*. at 187. Following a review hearing on August 7, the juvenile court again found that Mother had not complied with the case plan, service recommendations, or visitation, and Mother continues to test positive for illegal substances. The juvenile court changed A.D.'s permanency plan from reunification to adoption. *See id*. at 203-04.

[9] In September 2018, Mother completed a parenting assessment. Around the same time, Mother also tested positive for THC and, from October 2018 through January 2019, Mother failed to submit to drug screens and attend substance abuse treatment. In a January 2019 progress report, DCS detailed Mother's compliance with the dispositional decree since August 10, 2018. DCS reported that Mother had only complied with a substance abuse evaluation and parenting assessment; she had not complied with drug screens or substance abuse treatment; when Mother submitted to drug screens through Counseling for Change, she tested positive for methamphetamine and THC; and Mother stopped attending visitation in October 2017.

[10] DCS filed petitions to terminate Mother's parental rights on February 11, 2019. *See* Appellant's Appendix, Volume II at 57-59, 78-82. A staff advocate of court appointed special advocates ("CASA") was subsequently appointed for

Children.[5]  In March 2019, Mother's fiancé was arrested for domestic violence against her but the case was ultimately dismissed at Mother's request.  On April 16, 2019, CASA Deborah Gamache filed an update with the juvenile court in which she reported that Mother completed a parenting assessment and substance abuse evaluation; failed to follow through with treatment recommendations; and failed to complete a majority of the court ordered services.  CASA Gamache also reported that Mother has a "history of choosing men that are not conducive to living a clean healthy life style [sic] for herself or [C]hildren[,]" has "no visible means of financial stability[,]" has had her utilities turned off and back on several times during the case, and is displayed "around large amounts of money and illegal substances" on her social media account.  *Id*. at 133.  CASA Gamache further opined:

> Mother does not believe that her poor choices, PTSD, and anxiety will hinder her care of the [C]hildren. . . . [Mother] has shown a pattern that she cannot maintain her own mental health or substance abuse issues, stay clear of men that are violent and have criminal histories themselves, or . . . follow through of her [sic] own services that were court ordered[] to prove she would be able to do what is needed to raise her [C]hildren.  By her past and recent actions mentioned above and lack of follow through, she continues to show that there is an extremely high probability that she will not be able to remedy her circumstances to be able to provide a secure and safe environment in the future for [Children]. . . .

---

[5] The staff advocate in this case was a paid employee of CASA.  *See* Tr., Vol. II at 133-34.  In this opinion, we refer to the staff advocate as a CASA.

*Id*. at 134.

[11]   A fact-finding hearing was held on June 17, 2019, during which Mother testified she was currently engaged in treatment for her mental health issues. On August 2, the juvenile court entered separate orders[6] terminating Mother's parental rights to B.B. and A.D. and found, in relevant part:

> [B].7.  While the [DCS] assessment worker was outside Mother's home, a Vectren utilities truck parked outside the home.  The utility worker told the assessment worker that he was shutting off the gas and electric to the home.
>
> * * *
>
> [C].11. Mother has a history of being both the victim and, at times, perpetrator of domestic violence.  She testified that this has occurred with every father of her five (5) children, the most recent event occurring in March 2019 with another male; however, that cause was ultimately dismissed at [M]other's request, after [M]other attended a program for victims of domestic violence.
>
> * * *
>
> 16.     Mother was included in meetings, and attended Court hearings where the expectations to achieve reunification were clearly discussed with her by DCS, CASA, and the Court.

---

[6] Indiana Appellate Rule 38(A) provides that "[w]hen two (2) or more actions have been consolidated for trial or hearing in the trial court . . . , they shall remain consolidated on appeal."  Here, DCS filed two separate termination petitions and the juvenile court entered separate termination orders.  Because the juvenile court held a consolidated fact-finding hearing on both petitions, the two actions remain consolidated on appeal.

Mother was offered bus tokens for transportation and all her services were referred by and paid for by DCS. Mother did not ask for any additional or different services. Despite removing barriers for Mother, Mother still did not make the changes she needed to make to parent her [C]hildren.

* * *

19.    Mother believes she owes over $10,000 in unpaid child support for her son, L.S. She owes over $14,000 in unpaid child support for her daughters, Ba.S. and Bn.S.

20.    . . . Mother was offered substance abuse treatment and drug screens to establish sobriety. She was referred to Counseling for Change and had some early success and a brief period of sobriety in October of 2017. She was attending her drug screens regularly at this time. However, she stopped attending her appointments and relapsed on methamphetamine in November of 2017. She stopped attending treatment and her random drug screens and no showed from December of 2017 through June of 2018. When she again screened in July of 2018, she tested positive for methamphetamine and THC. She was again referred to drug treatment, but continued to no show for treatment and screens from October of 2018 through January of 2019. Mother sought treatment on her own at NOW Counseling in February of 2019 but stopped attending after a couple of weeks. She was again referred to treatment, but no showed to her intake appointment in March of 2019. Mother has never completed the court ordered substance abuse treatment.

* * *

22.    Mother refuses to acknowledge that she has a substance abuse issue or struggles with addiction. She denies the overdose that prompted the DCS investigation ever occurred. She testified

that she just woke up in the hospital and to this day has no knowledge of why she was there. Despite being presented with positive screens for methamphetamine on multiple occasions administered by various services providers since September of 2017, she continues to deny she ever used meth. She believes that her screens have been tampered with by her ex-boyfriend.

23. Mother acknowledges that she needs ongoing treatment for mental health issues, but refuses to take prescription drugs for her conditions. Instead she smokes marijuana and uses CBD oil.
. . .

* * *

25. Mother's communications with DCS were sporadic and non-cooperative. After relapsing in November of 2017, Mother was unheard from until late June of 2018. Attempts to contact her by the FCM and law enforcement at her home address were unsuccessful. She later was in contact for several months and then ceased communications again until February of 2019.

26. Mother admits that for much of the case she did not follow the orders of the Court and or complete services for reunification of her [C]hildren because she was attempting to avoid outstanding warrants for her arrest in Warrick and Vanderburgh County for various criminal and child support matters.

Appealed Order at 3, 5-8. Based on these findings, the juvenile court concluded:

27. [I]t does not appear that Mother is likely to remedy the reasons that the [C]hildren have remained out of her care.

28.     Beyond failing to follow the orders of the Court, Mother has engaged in actions during the pending CHINS which cause concern for the Court. Mother has continued to use illegal and impairing substances, has been absent and unavailable for extended periods in an attempt to avoid arrest, and has shown a pattern of failing to be able to provide for her [C]hildren. There is a reasonable probability that continuation of Mother's parental rights poses a threat to the well-being of the [C]hildren.

29.     CASA personnel testified that she felt it was in the best interest of the [Children] for [M]other's parental rights to be terminated, especially since so much time had passed since Mother had even visited with the [Children].

* * *

[D]. 7.     Mother has had ample time to show a change in her behaviors to bring about reunification. Permanency is critical for the [Children] and [they] should not have to wait any longer for permanency in this case;

8.     It is in the best interests of [Children] to be adopted due to the inability of the Mother to provide appropriate care and supervision for the [C]hildren;

9.     DCS and the [CASA] believe that adoption is in the [C]hildren's best interest. The Court finds that adoption is in the [C]hildren's best interest.

10.     Mother's pattern of continuing substance abuse, untreated mental health needs, financial instability, and criminal behavior indicates that maintaining a parent-child relationship with Child[ren] is not in the best interests of Child[ren.]

*Id*. at 8-9.[7]  Mother now appeals.  Additional facts will be supplied as necessary.

# Discussion and Decision

## I. Standard of Review

A parent's right to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution.  *In re D.D.,* 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied.*  Although parental rights are of a constitutional dimension, they are not without limitation and the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities.  *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008).  We acknowledge that the parent-child relationship is "one of the most valued relationships in our culture," but also recognize that "parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights."  *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 147 (Ind. 2005) (internal quotations omitted).  The involuntary termination of one's parental rights is the most extreme sanction a court can impose because termination severs all rights of a parent to his or her children.  *See In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.*  As such, termination is

---

[7] Although the juvenile court entered separate termination orders under separate cause numbers, the findings of fact and conclusions thereon are identical with respect to Mother.  Accordingly, in this opinion, we quote only one order.

intended as a last resort, available only when all other reasonable efforts have failed. *Id*. The purpose of terminating parental rights is to protect children, not to punish parents. *In re D.D.*, 804 N.E.2d at 265.

[13] When reviewing the termination of parental rights, we do not reweigh the evidence or judge the credibility of witnesses. *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied*. Instead, we consider only the evidence most favorable to the judgment and the reasonable inferences that can be drawn therefrom. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*; *cert. denied*, 534 U.S. 1161 (2002). Thus, if the evidence and inferences support the decision, we must affirm. *Id*.

[14] As required by Indiana Code section 31-35-2-8(c), the juvenile court entered findings of fact and conclusions thereon. Therefore, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings, then determine whether the findings support the judgment. *Bester*, 839 N.E.2d at 147. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id*.

## II. Statutory Framework for Termination

Before an involuntary termination of parental rights may occur in Indiana, DCS must allege and prove, in relevant part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). Notably, the provisions of Indiana Code section 31-35-2-4(b)(2)(B) are written in the disjunctive, and thus the juvenile court need only find one of the three elements has been proven by clear and convincing evidence. *See, e.g., In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009); Ind. Code § 31-37-14-2 ("[A] finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence."). If a

juvenile court determines the allegations of the petition are true, then the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

## III. Findings of Fact

[16] Because the judgment underlying the termination of Mother's parental rights contains specific findings of fact and conclusions thereon, we must first determine whether the evidence supports the findings. *In re A.S.*, 17 N.E.3d 994, 1002 (Ind. Ct. App. 2014), *trans. denied*. If the record contains no evidence to support the findings either directly or by inference, the findings are clearly erroneous. *In re S.S.*, 120 N.E.3d 605, 609 (Ind. Ct. App. 2019). Mother challenges the following findings of fact:

> [B].7. While the [DCS] assessment worker was outside Mother's home, a Vectren utilities truck parked outside the home. The utility worker told the assessment worker that he was shutting off the gas and electric to the home.

> * * *

> [C].11.  Mother has a history of being both the victim and, at times, perpetrator of domestic violence. She testified that this has occurred with every father of her five (5) children, the most recent event occurring in March 2019 with another male; however, that cause was ultimately dismissed at [M]other's request, after [M]other attended a program for victims of domestic violence.

> * * *

[C].16.     Mother was included in meetings, and attended Court hearings where the expectations to achieve reunification were clearly discussed with her by DCS, CASA, and the Court. Mother was offered bus tokens for transportation and all her services were referred by and paid for by DCS. Mother did not ask for any additional or different services. Despite removing barriers for Mother, Mother still did not make the changes she needed to make to parent her [C]hildren.

Appealed Order at 3, 5-6.

[17]     First, with respect to finding number B.7., Mother argues this finding is clearly erroneous because "[n]o testimony was taken as to whether [her] utilities would or would not be shut off at the time of the removal in the underlying CHINS [case]." Appellant's Brief at 17. However, there is evidence in the record to support this finding. DCS Exhibit 10, which contained DCS' Report of Preliminary Inquiry and Investigation filed with the juvenile court on September 5, 2017, was admitted at the fact-finding hearing, and states: "As FCM pulled up to [Mother]'s house a Vectren van was parked in front. When asked, the worker stated the power and gas were to be shut off." Exhibits, Vol. I at 89; *see also* Tr., Vol. II at 107. Furthermore, at the fact-finding hearing, FCM McDaniel testified that she was familiar with why the Children were removed and stated that during DCS' assessment, "Vectren had c[o]me to [Mother's] house and turned off her electricity. [Mother] had previous issues . . . with other utilities not working[.]" Tr., Vol. II at 110. Given the evidence, this finding is not clearly erroneous.

[18]     Regarding finding number C.11., Mother argues that a portion of this finding is clearly erroneous because, at the fact-finding hearing, she denied domestic violence in her current relationship. Specifically, Mother challenges the part stating, "She testified that [domestic violence] has occurred with every father of her five (5) children, the most recent event occurring in March 2019 with another male[.]" Appealed Order at 5-6. We conclude this finding is not clearly erroneous because, when asked at the fact-finding hearing whether she had ever been a victim of domestic violence, Mother replied, "Yes, with all of my exes." Tr., Vol. II at 79. Although Mother denied being a victim of domestic violence in her current relationship, *id*. at 63., Mother's current fiancé is not the father to any of her five children. Accordingly, we find no error.

[19]     Finally, Mother claims finding number C.16. is clearly erroneous because DCS never offered her any bus tokens for transportation. We agree there is no evidence in the record to support this portion of the finding and, as such, it is clearly erroneous. However, we conclude such error is harmless when considered in conjunction with the unchallenged findings and ample evidence presented to support termination of Mother's parental rights, as discussed below. *See In re A.S.*, 17 N.E.3d at 1003-06 (holding that despite several clearly erroneous findings of fact, DCS presented sufficient evidence to support termination of parental rights even absent the erroneous findings); *see also McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (unchallenged findings are accepted as true).

# IV. Conclusions of Law

## A. Remedy of Conditions

The juvenile court concluded there is a reasonable probability that the conditions that led to Children's removal and continued placement outside Mother's care will not be remedied. Mother challenges this conclusion and contends that DCS and the juvenile court "failed to consider [her] accomplishments which included maintaining stable housing and successes in her visitation." Appellant's Br. at 20. We disagree.

We engage in a two-step analysis to determine whether such conditions will be remedied: "First, we must ascertain what conditions led to [Children's] placement and retention in foster care. Second, we determine whether there is a reasonable probability that those conditions will not be remedied." *In re K.T.K.*, 989 N.E.2d 1225, 1231 (Ind. 2013) (quotation omitted). With respect to the second step, a juvenile court assesses whether a reasonable probability exists that the conditions justifying a child's removal or continued placement outside his parent's care will not be remedied by judging the parent's fitness to care for the child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). Habitual conduct may include criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment, but the services offered to the parent and the parent's response to those services can also be evidence of whether conditions will be remedied. *A.D.S v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct.

App. 2013), *trans. denied*. DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change." *In re I.A.,* 903 N.E.2d at 154.

[22] The uncontroverted evidence establishes that Children were initially removed from Mother's care due to her substance abuse and mental health issues, specifically her overdose/attempted suicide, as well as unsuitable home conditions. Based on Mother's non-compliance with services, pattern of evading warrants, continued mental health and substance abuse issues, and financial instability, Children remained outside of Mother's care. We conclude that DCS presented sufficient evidence to support the juvenile court's conclusion that there is a reasonable probability that these conditions will not be remedied.

[23] First, throughout this case, Mother's compliance with services was brief and intermittent, demonstrating her lack of commitment toward reunification and unwillingness to address her overall instability. In October 2017, the juvenile court ordered that Mother maintain weekly contact with DCS; complete a substance abuse assessment and follow all treatment recommendations; submit to random drug screens; refrain from drugs and alcohol; attend supervised visitation; and cooperate with parent aid and mental health services and follow all treatment recommendations. The evidence reveals that Mother was initially compliant. Mother attended Counseling for Change, submitted to drug screens, and participated in supervised visitation. Based on Mother's compliance and

sobriety, DCS recommended unsupervised visitation in November 2017. However, Mother would fail to show for the visits and was placed on a two-hour call ahead, which she also failed to comply with. Ultimately, Mother refused to have visits with Children separately[8] and, when a parent aide visited her home to assist with transportation, Mother refused to have a visit. Mother subsequently missed three visits without calling ahead and DCS placed visitation on hold. Mother has not participated in visitation since that time.

[24] In November 2017, Mother ceased all contact with DCS. FCM McDaniel testified that, between January and June of 2018, she attempted to reach Mother eight or nine times but was unsuccessful. After Mother was arrested in June 2018, McDaniel was able to contact Mother and put in a new referral for a substance abuse evaluation and parenting assessment. Mother returned to Counseling for Change. Although Mother completed a parenting assessment and, at some point, a substance abuse evaluation, she failed to submit to drug screens or attend substance abuse treatment from October 2018 to January 2019. At the fact-finding hearing, Mother conceded she was not currently submitting to drug screens anywhere but testified that, in the last month and a half, she has been engaged in weekly treatment at Virtual Consultant to address her extreme social anxiety and PTSD. Specifically, Mother sought this treatment through her own initiative and was participating in eye movement

---

[8] As previously stated, Children were placed in separate homes at this time. Therefore, due to scheduling conflicts, Mother had separate visitations with each child.

deferral reprocessing ("EMDR") treatment, which she described as "basically reprogramming our belief system and any kind of negative patterns you have." Tr., Vol. II at 77.

[25] Although Mother has recently engaged in EMDR, she never completed substance abuse treatment and consistently failed to demonstrate sobriety during this case. In August 2017, when Mother was admitted to the hospital for an overdose/suicide attempt, she tested positive for methamphetamine, amphetamines, benzodiazepine, and marijuana. After Mother's brief period of compliance and sobriety in November 2017, she tested positive for methamphetamine. Mother then disappeared for six months in an effort to evade outstanding warrants for her arrest and subsequently tested positive for amphetamine, methamphetamine, and THC in July 2018. Mother's last drug screen was in September or October of 2018 and she tested positive for THC.

[26] Second, not only did Mother fail to complete substance abuse treatment, she continues to deny that she has a substance abuse issue and she refuses to acknowledge the overdose that prompted DCS' involvement. *See* Tr., Vol. II at 67-68, 102. At the fact-finding hearing, Mother testified she did not believe she needed substance abuse treatment. *See id.* at 62. She stated, "Substance abuse is not an issue. It's nothing for me not to use. I don't have issues with that." *Id*. at 102. Instead, Mother believes her main issue is her mental health and emotional trauma. Mother's denial and failure to complete treatment constitutes strong evidence that she is unlikely to remedy her substance abuse issues without treatment she is unwilling to undergo.

Third, Mother's history of neglect, failure to provide support for her children, and criminal history support the juvenile court's conclusion that it is unlikely Mother will remedy the conditions that led to Children's removal and continued placement outside of her care. Mother has five children, all of whom have been removed from her care, as well as a history with DCS that began in 2008, when Mother's child, L.S., was removed from her care because she was arrested and charged with battery. *See id.* at 37; Exhibits, Vol. I at 3-6. In 2014, two of Mother's children, Ba.S. and Bn.S., were the subject of a CHINS petition and removed from her care. Mother recalled the underlying circumstances of the petition – that she had gone to the hospital and tested positive for methamphetamine and THC. As a result, she was ordered to complete visitation and substance abuse treatment; however, Mother conceded that she did not complete treatment. *See* Tr., Vol. II at 45; *see also* Exhibits, Vol. I at 40-52. Notably, in 2015, shortly after birth, B.B. tested positive for methamphetamine, THC, and Demerol. B.B. was adjudicated a CHINS, Mother participated in services, and matter was dismissed in the spring of 2016. *See* Exhibits, Vol. I at 24-38. Mother also estimated that she owed $10,000 in child support for L.S. and $14,000 in child support for Ba.S. and Bn.S.

Moreover, Mother's criminal history is comprised of multiple battery convictions, residential entry, trespass, possession of paraphernalia, conversion, battery resulting in bodily injury, theft, and two convictions for public intoxication and disorderly conduct. Although Mother's most recent conviction was in 2015, she admitted that she did not participate in court

ordered services in an effort to avoid outstanding warrants for her arrest in Warrick and Vanderburg County. *See* Tr. Vol. II at 56-58. Mother's decision to avoid the warrants ultimately hindered any progress in this case and CASA Gamache testified that there were various issues preventing reunification, including Mother's severe anxiety and mental health. However, Gamache stated the big factor was Mother's evasion of several warrants: "The one big stickler, when she was not doing services and not contacting anybody when she had warrants was a huge, huge, stumbling block and we lost an awful lot of time during that process because she did not want to go to jail." *Id*. at 136.

[29] Lastly, Mother failed to make any progress with respect to her ability to provide for Children. At the fact-finding hearing, Mother detailed her work history. She was currently unemployed and her most recent job was in 2017 at Sonic, where she worked one eight-hour shift. Prior to that, in 2015, Mother worked at McDonald's for three months and Farbest for three days; and in 2012, Mother had a job at Prime Foods for approximately a month and a half. Mother further stated that her monthly income is comprised of one $190 utility check from Section 8 and roughly $250 from donating plasma. Mother planned to obtain social security disability, which she had already been denied several times, and failed to engage in any services toward obtaining employment.

[30] Overall, Gamache opined that Mother did not take advantage of the services offered to her and, when asked whether she believed it was likely that Mother would remedy the conditions that led to Children's removal, Gamache responded, "Not at this time. [Mother] seems to keep putting herself into

situations where she's repeating the cycles over and over again." *Id*. at 137.
FCM McDaniel agreed and stated:

> [Mother] has been offered services for approximately 2 years now off and on. She was also offered services prior through other cases. This has been an ongoing issue with her drug issues. She also does not have any income. These [C]hildren are kids that need stability in their lives and consistency. Somebody also that can maintain their own therapeutic needs plus the [Children]'s therapeutic needs. And at this time[,] I don't believe that [Mother] can do that.

*Id*. at 117.

[31]    A parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services demonstrates the requisite reasonable probability that the conditions will not change. *Lang*, 861 N.E.2d at 372. Such is the case here and, ultimately, Mother's argument is simply a request to reweigh the evidence in her favor, which we cannot do. *See id.* at 371. Although we commend Mother's initiative by recently participating in EDMR, she has demonstrated a pattern of non-compliance and unwillingness to remedy her instability. Therefore, we conclude the juvenile court's findings supported its conclusion that there is a reasonable probability that the conditions that led to Children's removal and continued placement outside Mother's care will not

be remedied.[9] *See, e.g., In re E.M.*, 4 N.E.3d at 644 (findings regarding a parent's continued non-compliance with services supported juvenile court's conclusion the conditions under which children were removed from the parent's care would not be remedied).

## B. Best Interests

[32] Mother also challenges the juvenile court's conclusion that termination of her parental rights is in Children's best interests. "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). In determining what is in the best interests of the child, the juvenile court must look beyond the factors identified by DCS and look to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. In doing so, the juvenile court must subordinate the interest of the parents to those of the child. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). And the juvenile court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id*. Recommendations of the FCM and CASA, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by

---

[9] Having determined that DCS met its burden of showing that the conditions that resulted in Children's removal and continued placement outside of Mother's care will not be remedied, we need not address whether DCS met its burden of proving that the continuation of the parent child relationship poses a threat to Children's well-being. *K.T.K.*, 989 N.E.2d at 1234.

clear and convincing evidence that termination is in the child's best interest. *In re A.S.*, 17 N.E.3d at 1005.

[33] Here, the FCM and CASA both testified that termination of Mother's parental rights is in Children's best interests. *See* Tr., Vol. II at 117, 138. At the fact-finding hearing, FCM McDaniel explained, "I do not believe that [Mother] can provide the consistency or the sobriety that is needed at this time." *Id*. at 117. In addition, McDaniel opined there is a threat of harm to the Children if Mother's rights are not terminated because Mother "has not demonstrated that she can live a sober lifestyle." *Id*. CASA Gamache testified that "with the amount of time that has gone by" in this case, termination is in Children's best interests. *Id*. at 138. Having already concluded there is ample evidence in the record that the conditions resulting in removal will not be remedied, we conclude this testimony is sufficient to support the juvenile court's conclusion that termination of Mother's parental rights is in Children's best interests. *See In re A.S.*, 17 N.E.3d at 1005.

# Conclusion

[34] We conclude that DCS presented sufficient evidence to support the juvenile court's order terminating Mother's parental rights to Children. Thus, the juvenile court's order was not clearly erroneous, and we affirm.

[35] Affirmed.

Bradford, C.J., and Altice, J., concur.